Clarence P. Chamberlin v. Commissioner.
Chamberlin v. Commissioner
Docket No. 110095.
United States Tax Court
1943 Tax Ct. Memo LEXIS 192; 2 T.C.M. (CCH) 469; T.C.M. (RIA) 43347; July 19, 1943
*192 On December 23, 1939, petitioner made gifts to three trusted employees whom he regarded as keymen of a corporation of which he was president and the dominant stockholder. At the time of the gifts and as a condition thereto, petitioner required the donees to enter into agreements with him which, among other things, prevented the donees from selling or disposing of any of the shares of stock without first offering to sell said shares to petitioner, if living, or otherwise to his wife, at a price equal to the book value of the stock as shown on the balance sheet of the corporation at the end of the month preceding the date of offer. Petitioner, in returning the gifts for gift taxation, valued the stock at what he conceived to be its book value on the date in question. The Commissioner, in his determination of the deficiency, has greatly increased this valuation and contends that no consideration should be given to the restrictive agreements. Held, the restrictive agreements do not conclusively fix the value of the stock as contended by petitioner but such restrictive agreements as are in evidence in the instant case must be taken into consideration along with other elements of value *193 to fix the fair market value of the stock on the basic date. Held, further, on consideration of all the evidence in the record, including the restrictive agreements, the Court fixes the fair market value of the stock on the date of the gifts. Raymond H. Berry, Esq., and Arthur L. Evely, Esq., for the petitioner. Paul A. Sebastain, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in gift tax of $7,894.23 for the year 1939 against petitioner. The deficiency results from the Commissioner's increasing the value of certain gifts made by petitioner in 1939 to the three of the employees of a corporation of which he was the president and principal stockholder from $35,490.57, as reported on the gift tax return of petitioner, to $116,146,34. The Commissioner explained the foregoing adjustment in his deficiency notice, as follows: It is held that in accordance with Article 19 of Regulations 79, the fair market value of a share of the capital stock of the Metal Mouldings Corporation as at December 23, 1939 was $2,500.00, and that the fair market value of 50 shares of such corporation's capital stock given by you on that *194 date to three individuals had a total fair market value of $125,000.00. Allowance is made for increased gift tax liability assumed by donees. By appropriate assignments of error petitioner contests the increase in valuation which the Commissioner has made. Thus the entire deficiency is contested. Findings of Fact The petitioner, Clarence P. Chamberlin, is an individual and resides at 116 Elm Park, Pleasant Ridge, Michigan. On December 23, 1939, the petitioners made a gift of 25 shares of the capital stock of Metal Mouldings Corporation, a Michigan corporation, to John H. Toner; a gift of 15 shares of the capital stock of the corporation to Benjamin J. Carl; and a gift of 10 shares of the capital stock of the corporation to Guy V. Schrock. All of the donees are employees of the Metal Mouldings Corporation and each of them is a resident of Detroit, Michigan. The aforesaid gifts of stock of Metal Mouldings Corporation were made subject to the terms and provisions of certain written agreements between the petitioner and each respective donee, each dated December 23, 1939. These agreements, identical in terms with the exception of the name of the donee and the number of shares involved, *195 prevented the donees from selling or disposing of any of the shares of stock without first offering to sell said shares to the petitioner, if living, or otherwise to his wife, Grace A. Chamberlin. The agreements provided that the shares should be offered at a price equal to the book value of the stock as determined by the aggregate amount of the capital stock, surplus and undivided profits accounts of the Metal Mouldings Corporation as shown on the balance sheet of the corporation at the end of the month preceding the date of offer. The petitioner or his wife were required to accept such offer of sale within thirty days, otherwise the donees had the right to sell or dispose of said stock in any manner and to any person they saw fit. In the event of the death of both the petitioner and his wife, the stock was freed from all restrictions contained in the agreement. Each agreement further provided that in the event of the death of the donee, the petitioner, if living, or otherwise his wife, had an option to purchase from the donee's estate the shares of stock at a price determined in the same manner as hereinbefore set forth. It was provided that this option must be exercised within *196 thirty days and, in the event of the failure to so exercise it, the stock was freed of any restriction contained in the agreement. The stock certificates delivered to the donees and representing the aforesaid gifts, each bore an endorsement as follows: "This certificate is issued subject to the terms and conditions of the certain agreement in writing between Clarence P. Chamberlin and (name of donee), bearing date of December 23, 1939." This endorsement was required by the terms of the agreements. On February 13, 1940, the petitioner filed with the Collector of Internal Revenue at Detroit, Michigan, a gift tax return reporting the aforesaid gifts of the capital stock of the Metal Mouldings Corporation. In this gift tax return the petitioner reported the net value of the gifts as $35,490.57 and made the following explanation: Value of Stock: The value of the stock as of December 23, 1939, the date of the gifts, is the book value as of November 30, 1939, in view of restriction on sale of stock which was a condition of the gifts. The donees agreed not to dispose of the stock without offering the same to donor or his wife at a price equal to the book value of the end of the month *197 preceding the offer. See copy of agreement between John H. Toner and C. P. Chamberlin attached hereto. Identical agreements were executed by Benjamin J. Carl and by Guy V. Schrock in respect to the stock received by them. Gift Tax Offset: The total value of the stock is decreased by $959.43, the gift tax liability arising from the gift, by reason of the fact that the donees received the stock subject to this liability. See copy of agreement attached. On December 1, 1935, petitioner had made a gift of 50 shares of capital stock of Metal Mouldings Corporation, not subject to any restrictive agreement, and had reported said gift for gift tax purposes using a value of $1,100 a share. This value was accepted by the Government. At the time of this gift Metal Mouldings Corporation had outstanding 401 shares of capital stock. Thereafter and on December 28, 1935, Metal Mouldings Corporation declared and paid a stock dividend of 150 per cent. After this dividend and for all years subsequent thereto, the corporation had outstanding, 1,002 1/2 shares of capital stock. Metal Mouldings Corporation is a Michigan corporation, incorporated in December 1924 and from its inception has been engaged *198 in the manufacture of metal mouldings. Prior to 1928 the corporation manufactured principally weather strippings and mouldings used in connection with building construction. In 1928 it began to supply metal mouldings to automobile manufacturers and from that time on the corporation was engaged primarily in the manufacture of metal mouldings for use as trimming on automobiles and automobile bodies. In 1939 the corporation had approximately 500 employees. In 1939 practically all of the corporation's sales were made to two automobile manufacturers. Its product did not constitute a functional or operative part of the automobile but was solely of an ornamental or decorative character. In 1939 Metal Mouldings Corporation owned no real estate, but occupied, under lease, the first floor and basement of a fourstory building located on Wesson Avenue, Detroit, Michigan, using 89,000 square feet of floor space in said building. On December 31, 1939, the fixed assets of the corporation consisted of light machinery and equipment. The principal machines were light hand-fed presses, hand and power benders, polishing equipment, sanding equipment and plating equipment. It owned no machines of special *199 design or special equipment not used by other competing corporations. The corporation owned no patents, patent rights, or secret processes. There were no investments in stocks of other corporations or in commodities. Its machinery and equipment were adaptable only for the production of automobile mouldings and could not be used profitably for other kinds of business on a volume basis. The balance sheet of Metal Mouldings Corporation as of December 31, 1939, was as follows: ASSETS
Cash
$ 272,585.11
Notes and accounts receivable
$258,091.05
Less reserve for bad debts
485.69
257,605.36
Inventories: Raw materials
64,871.53
Work in process
50,945.52
Supplies
314.06
116,131.11
Investments: United States Treasury bills
256,093.76
Accrued interest
1,103.41
Capital assets
182,274.81
Less reserve for depreciation
74,653.91
107,620.90
Prepaid expense
17,956.82
Total Assets
$1,029,096.47
LIABILITIES
Accounts
$ 99,118.29
Dividend payable
100,250.00
Federal income tax
92,001.85
Insurance reserve
719.21
Reserve for new building
250,000.00
Common stock
100,250.00
Earned surplus and undivided profits
386,757.12
Total Liabilities
$1,029.096.47
*200 The net taxable income of Metal Mouldings Corporation, the amount of Federal income tax paid by it, the net income after tax, and the dividends declared by said corporation during each calendar year since its organization to and including the year 1939 were as set forth in the following table: (Losses are shown in parentheses.) Federal
Net
Total
Net
Income
Income
Dividends
Year
Income
Tax
After Tax
Declared
1924
$ None
$ None
$ None
$ None
1925
(7,559.62)
None
(7,559.62)
None
1926
(4,401.67)
None
(4,401.67)
None
1927
14,175.50
28.92
14,146.58
None
1928
(1,896.82)
None
(1,896.82)
None
1929
(12,851.85)
None
(12,851.85)
None
1930
18,472.17
86.82
18,385.35
None
1931
(4,749.78)
None
(4,479.78)
None
1932
(27,768.06)
None
(27,768.06)
None
1933
16,163.23
2,222.44
13,940.79
None
1934
37,788.62
5,210.36
32,578.26
None
1935
352,576.36
64,629.13
287,947.23
80,200.00
1936
405,634.08
84,986.67
320,647.41
180,450.00
1937
368,686.86
74,922.33
293,764.53
175,437.50
1938
333,322.25
59,555.31
273,766.94
175,437.50
1939
509,011.01
92,120.35
416,880.66
300,750.00 *
*201 The annual gross sales of Metal Mouldings Corporation for the years 1930 to 1939, inclusive, were as set forth in the following table: 1930
$ 337,069.08
1931
218,987.60
1932
178,203.88
1933
250,881.49
1934
496,146.68
1935
1,852,350.24
1936
2,304,183.78
1937
2,371,913.52
1938
1,600,386.03
1939
2,187,817.93
The percentages of net earnings of Metal Mouldings Corporation to its book investment for the following years were: Year
Percentage
1930
40%
1933
48.8%
1934
53.7%
1935
108 1/2%
1936
79.3%
1937
55.78%
1938
43.7%
1939
56.6%
Throughout the year 1939 Metal Mouldings Corporation had outstanding 1,002 1/2 shares of capital stock. There was only one class of stock outstanding and its par value $100was per share. Metal Mouldings Corporation is engaged in a competitive business. It has numerous competitiors consisting of other corporations directly engaged in the business of manufacturing metal mouldings for the automotive trade. In addition some of the automobile manufacturers themselves are equipped to manufacture their own metal mouldings either directly or through subsidiaries such as Briggs Manufacturing Company. In 1938 Briggs Manufacturing *202 Company started a new division and built a new plant for the manufacture of automobile mouldings and, as a result, Metal Mouldings Corporation lost its business of manufacturing body mouldings for the Plymouth automobile. Ford Motor Company has facilities for the production of automobile mouldings and manufactures a part of its requirements. The product manufactured by Metal Mouldings Corporation constituted an ornamental part or the "bright work" of the automobile and automobile body and the corporation's business depended almost entirely on the prevailing automobile design and styling. A determination by automobile designers to change automobile style by eliminating metal trim would seriously curtail the corporation's business. Experiments are being carried on by automobile manufacturers and others for the use of plastics for automobile body construction and trim instead of metal trimmings. In 1939 plastic material was being used by Chrysler for trim on the instrument panels and interior of automobiles with resulting loss of business to Metal Mouldings Corporation. During the year 1939 and for a number of years prior thereto, 96 per cent of the sales of Metal Mouldings Corporation *203 were made to two automobile manufacturers, Ford Motor Company and Chrysler Corporation. The business of these two automobile companies is placed with Metal Mouldings Corporation between January and May of each year and the business so obtained normally continues for the period of the model year of the manufacturer. No further business can be obtained after this period from the automotive industry. In the case of Ford Motor Company the contract called for the filling of orders for a specified quantity of parts, each of which orders normally covered a three month period of production. The Ford Motor Company was under no contractual obligation to continue to place such orders under its contract. In the case of Chrysler Corporation the contract called for the supplying of a certain percentage of Chrysler requirements for metal mouldings on a particular model. The Chrysler business was first obtained in 1928 and the Ford business was acquired in 1932. In the case of both Ford Motor Company and Chrysler Corporation, the dies used in the production of the mouldings were the property of the automobile manufacturers, not of Metal Mouldings Corporation, and these customers could remove the *204 dies from the Metal Mouldings Corporation plant at any time, thereby suspending its production. The corporation would not be in existence if it did not have the automobile metal trim business. Because of the character of the corporation's business, its filed of customers is limited. The management of Metal Mouldings Corporation was largely in the hands of two individuals, Clarence P. Chamberlin, president, and John H. Toner, general manager. Chamberlin also had direct charge of the sales and engineering work of the corporation and serviced and had charge of the accounts of Ford Motor Company and Chrysler Corporation. He had no assistant in this work and the corporation did not maintain any sales organization as such. No one in the organization of Metal Mouldings Corporation was capable of performing the duties handled by Chamberlin. John H. Toner was vice president and general manager of Metal Mouldings Corporation and was responsible for the production operations of the corporation. His services would have been difficult to replace. John H. Toner was one of the donees of the stock, the valuation of which is in issue. The remaining donees were Benjamin J. Carl, the assistant treasurer *205 and assistant secretary of Metal Mouldings Corporation who was in charge of the corporation's accounting department, and Guy V. Schrock, the factory manager of Metal Mouldings Corporation. The stock of Metal Mouldings Corporation is not listed on any exchange and there have been no sales of the stock since 1931. The fair market value of the 50 shares of stock of Metal Mouldings Corporation which was the subject of the gift by Chamberlin to the three individuals heretofore named was $1,400 per share at the time of the gifts, exclusive of the gift tax liability assumed by the donees. The foregoing findings have been made from an agreed stipulation of facts and oral testimony. Any of the facts which were stipulated and not embodied in the foregoing findings are incorporated herein by reference. Opinion BLACK, Judge: The only issue presented to us in this proceeding for decision is: What was the value of the 50 shares of Metal Mouldings Corporation stock at the time of the gifts? Section 506 of the Revenue Act of 1932 reads as follows: SEC. 506. GIFTS MADE IN PROPERTY. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the *206 gift. The Commissioner in his deficiency notice stated that in making this determination he was relying upon Article 19 of Regulations 79. The relevant portions of that article are printed in the margin. [1]
*207 The Commissioner in his determination of the deficiency fixed the value of the stock at $2,500 per share as against a value of $759 per share used by petitioner in the gift tax return which he filed. It requires no citation of authority for the establishment of the principle that the Commissioner's determination is presumptively correct and that the burden of proof is on petitioner to show that the Commissioner's determination is error. However, it is plain that this is no lack of evidence case. There is much evidence in the record from which it is our duty to make a finding of the fair market value of the stock on the basic date and this we have done. We do not understand respondent to contend that this is a lack of evidence case and that we should sustain his determination because it is presumptively correct. It is respondent's contention that the evidence in the record fully sustains his determinations that the stock had a fair market value of $2,500 per share at the time the gifts were made. Respondent bases this contention upon the earning power and dividend-paying record of the stock and argues that no consideration should be given to the restrictive agreements upon the sale *208 of the stock which were entered into by the donor and each donee at the time of the gifts of the sotck. In making this contention, respondent relies upon Article 3, Regulations 79, printed in the margin. [2]
The respondent in making this argument states, among other things: * * * the gift tax is * * * a tax upon the transfer of property from the donor to the donee, and what is taxed is the interest which passes from the donor not the interest which the donee receives. In the instant case the market value of the stock on December 23, 1939, was the market value free from any restriction *209 when it passed from the donor to the donees. We agree with the first sentence of the foregoing statement but we do not agree with the latter sentence for reasons which we will more fully state later in this opinion. At this point we will only say that we do not think that the quoted regulations have any bearing upon the effect which restrictive agreements may have on the fair market value of stock imposed at the time of the gifts. We do not think the regulations were intended to cover that subject at all. It is petitioner's contention that the restrictive agreements had the absolute effect of limiting the fair market value of the stock to its book value on a date thirty days prior to the date of gift. Thus contending, the petitioner returned the stock at a value of $759 per share on his gift tax return. Incidentally it may be remarked that the stock had a greater book value than $750 per share. As we figure it, the book value of the stock on the basic date was about $980 per share and petitioner appears to agree in his reply brief that the latter figure of $980 represents the book value of a share of the stock on the basic date. We do not agree with the Commissioner's contention *210 that in deciding what was the value of the shares of stock on the date of gift we should disregard the restrictive agreements. On the other hand, we do not agree with petitioner's contention that the fair market value of the stock on the date of gift is absolutely limited to the book value of the stock because of the provisions contained in the restrictive agreements. We think that the true rule is that in arriving at the correct fair market value of the stock on the date of the gift, we must consider all elements of value which are in evidence, including the restrictive agreements. This we have done and have arrived at a finding of $1,400 per share fair market value of the stock on the date of the gifts. There are many cases by the Board and the courts which deal with varying phases of the effect on the fair market value of stock of restrictive agreements. Some of these cases are cited by the Commissioner and some are cited by the petitioner. We shall make no attempt to cite and comment upon all of them. One of the latest of these cases is , reversing and remanding *211 . In that case the restrictive agreements as to the sale of the stock had many points of similarity to the restrictive agreements which were present in the instant case. The court in its decision approved the Board's holding that the restrictive agreements which were present in that case did not set the value of the stock at book value. In that respect the court held that "The amendment [restrictive agreement] did not prohibit sales of the stock except at book value, nor did it fix book value as a call price at which at the behest of the corporation the stock must be sold. It fixed a limitation on the price obtainable by a shareholder for his shares only if he wished to sell and if the corporation at that time wished to buy." But while the court approved the Board's holding on that point it went further and said that such restrictive agreements must be considered as one of the factors bearing upon the fair market value of the stock and that the Board had not done this. The court thereupon reversed the Board. The effect of the court's reversal in that case was to require the Board to consider the restrictive agreements *212 which were present in that case, along with other factors present, in fixing the fair market value of the stock on the basic date. Cf. ; certiorari denied, . In arriving at a valuation of $1,400 per share of the stock on the basic date we have given full consideration to the restrictive agreements which are in evidence. We have also given consideration to the assets and liabilities of the corporation; to its earning and dividend-paying record; to the character of the business of the corporation and its future prospects, and to the management of the business and to its hazards. We have also considered the expert testimony of two witnesses who testified as witnesses for the petitioner. These witnesses were experienced in the valuation of stocks and bonds and both appeared well qualified to give testimony as experts on valuation such as we have here. One of these witnesses, Charles B. Krause, testified that in his opinion the value of the stock of Metal Mouldings Corporation as of December 23, 1939, was $1,400 per share. The other one of petitioner's expert witnesses was Ralph *213 E. Badger. He testified that in valuing the 1,002 1/2 shares of the outstanding stock of Metal Mouldings Corporation on the basic date he arrived at a figure of $1,482 per share. But he discounted that value for reasons stated in his testimony as follows: * * * That, [referring to the above figure of $1,482] in my opinion, was the value you would place on a small block of that stock not marketed, but I flgured that if a block of any size had to be distributed or marketed, there would be a ten percent reduction thereon, which would reduce the per share value from $1,482.00 to $1,335.00, which is the value I found per share, and that I believe is the maximum value which could be placed on the stock as of December 23, 1939. Both witnesses testified that the respective values which they attributed to the stock on the basic date were arrived at without regard to the restrictive agreements in evidence and that these restrictive agreements would have a tendency to reduce the fair market value of the stock from the figures which they each gave in their testimony. However, neither witness gave any figures as to how much he thought the restrictive agreements would reduce the fair market value *214 of the stock. The respondent did not offer the testimony of any expert witness. As already stated, considering all elements of the value as we understand them, including the restrictive agreements which are in evidence and giving due consideration to the expert testimony, we have found that the fair market value of the 50 shares which were the subjects of the gifts on December 23, 1939, was $1,400 per share on that date, exclusive of the gift tax liability assumed by the donees. That valuation should be used in a recomputation under Rule 50. Decision will be entered under Rule 50. Footnotes
*. Of this amount, $100,250.00 was a dividend declared on December 26, 1939, payable to all stockholders of record January 15, 1940, and said dividend was paid on January 15, 1940.↩
1. Art. 19. Valuation of property. - (1) General. - The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * * * *
(3) Stocks and bonds. - The value at the date of the gift in the case of stocks and boads, within the meaning of the statute, is the fair market value per share or bond on such date. * * * * *
If the value of a security cannot be determined by sales, or from bid and asked prices, as described in the preceding provisions of this subdivision, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. Complete financial and other data upon which the donor bases his valuation should be submitted with the return.↩
2. Art. 3. Cessation of donor's dominion and control. - The tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor and attaches regardless of the fact that the identity of the donee may not be known or ascertainable.↩